753 F.2d 1132
 243 U.S.App.D.C. 394
 WHW ENTERPRISES, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Radio Portage, Inc., Portage, Michigan, Intervenor.
The AIR-BORNE GROUP, LTD., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Radio Portage, Inc., Portage, Michigan, Intervenor.
James R. SEARER, James M. Searer and Susan L. Homan d/b/a
Sear Broadcasting Company, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Radio Portage, Inc., Portage, Michigan, Intervenor.
 Nos. 83-2067, 83-2071 and 83-2072.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 16, 1984.
Decided Feb. 5, 1985.
 
 Petitions for Review of an Order of the Federal Communications commission.
 James L. Blair, Rockville, Md., with whom Robert A. Bernstein, Rockville, Md., was on brief, for appellant, WHW Enterprises, Inc. in No. 83-2067.
 Angela J. Campbell, Washington, D.C., with whom Richard R. Zaragoza and Clifford M. Harrington, Washington, D.C., were on brief, for appellant, Air-Borne Group in No. 83-2071.
 Howard M. Weiss, Washington, D.C., was on brief for appellant, Sear Broadcasting Co., in No. 83-2072.
 Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, General Counsel, Daniel M. Armstrong, Associate General Counsel and R. Barthen Gorman, Counsel, F.C.C., Washington, D.C., were on brief, for appellee in Nos. 83-2067, 83-2071 and 83-2072.
 John C. Quale and Robert A. Beizer, Washington, D.C., entered appearances for intervenor, Radio Portage, Inc., in Nos. 83-2067, 83-2071 and 83-2072.
 Before TAMM, MIKVA and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 In this case, we review a decision of the Federal Communications Commission ("FCC" or "Commission") granting Radio Portage, Inc. ("RPI") authority to construct an FM broadcast facility in Portage, Michigan. In September 1975, the FCC allocated channel 299, a class B FM broadcast facility, to Kalamazoo, Michigan.[1] Four applicants competed before the Commission for this channel--RPI, WHW Enterprises, Inc. ("WHW"), the Air-Borne Group, Ltd. ("Air-Borne"), and Sear Broadcasting Company ("Sear"). Of the four, only WHW proposed Kalamazoo as its city of license; the other three applicants proposed to locate their stations in Portage, a separate contiguous community.
 
 
 2
 In an initial decision dated August 3, 1981,[2] the Administrative Law Judge ("ALJ") granted Air-Borne's application. The ALJ first determined that Portage had a greater need for additional radio service than did Kalamazoo. Accordingly, he awarded the Portage applicants a dispositive preference under section 307(b) of the Federal Communications Act (the "Act"),[3] thereby eliminating WHW from further consideration.[4] The ALJ next disqualified RPI after concluding that its president had lacked candor and had attempted to mislead the Commission.[5] He then awarded the grant to Air-Borne, finding its integration of ownership and management superior to that of Sear.[6]
 
 
 3
 On appeal, the Review Board ("Board") upheld the ALJ's determination that Portage was more deserving of new radio service than Kalamazoo, and that the Portage applicants were therefore entitled to a dispositive preference under section 307(b).[7] The Board reversed the ALJ's disqualification of RPI, however, exonerating its president, Emil J. Popke, from all charges of misrepresentation and lack of candor. The Board then conducted a "fresh comparison" of the three Portage applicants and found RPI the most deserving, by virtue of its superior integration of ownership and management.[8] The Commission declined to overturn the decision of the Board, and this petition by the three unsuccessful applicants followed.
 
 
 4
 Before this court, the petitioners have raised a number of challenges to the decision below. We find it necessary to address only two of these.[9] First, we find the dispositive preference awarded the Portage applicants under section 307(b) consistent with both agency and judicial precedent, and we therefore affirm the Board's decision on this matter. However, we reverse the Board's determinations with respect to the misrepresentation and lack of candor charges, and remand for further proceedings on these issues, consistent with this opinion.
 
 I. THE 307(b) ISSUE
 A. Background
 
 5
 The ALJ found that the city of Kalamazoo had three fulltime and two daytime-only radio stations serving approximately 86,000 residents. Portage, with a population of nearly 34,000 residents, had one daytime-only station. All four applicants proposed placing broadcast signals over both cities.[10] The Portage applicants submitted extensive demographic data describing the civic, educational, social, governmental and cultural characteristics of Portage.[11] Appellant WHW, however, expressly declined to provide a similar profile of Kalamazoo, and failed to offer any evidence demonstrating the interdependence of Portage and Kalamazoo.[12] As a result, the ALJ concluded that, although the two cities share a common border, Portage is nevertheless a separate and distinct community.[13]
 
 
 6
 As noted above, section 307(b) of the Act provides that, in considering applications for radio licenses, the Commission must provide a fair, efficient, and equitable distribution of radio service to as many communities as possible. In making such a determination, the Commission has been guided by three principal objectives: (1) provision of some service to all of the nation or as much as possible; (2) provision of as many program choices to as many listeners as possible; and (3) service of local origin to as many communities as possible. Revision of FM Broadcast Rules, 40 F.C.C. 662, 664 (1962). Both the ALJ and the Board concluded that neither of the first two factors were of any decisional significance, since none of the petitioners' proposals involved any unserved areas and the Kalamazoo-Portage area already enjoys an abundance of program choice.[14] However, the ALJ and the Board found that the local service criterion weighed decisively in favor of the Portage applicants, since Kalamazoo, with a population approximately two and a half times that of Portage, has five times as many aural broadcast facilities.[15] This preference of Portage over Kalamazoo disposed of WHW's application, and the Board found it unnecessary to rule on its comparative qualifications vis-a-vis the other applicants.[16]
 
 B. Analysis
 
 7
 Over 30 years ago, the Supreme Court established that where mutually exclusive applicants seek to serve different communities, the Commission must initially determine which of the communities has a greater need for additional services, without first finding that the applicants are equal in their ability to serve their respective communities. FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 360-62, 75 S.Ct. 855, 857-58, 99 L.Ed. 1147 (1955). If this were not the rule, the Court reasoned, then "the needs of the community would be subordinated to the ability of an applicant for another locality." Id. at 361-62, 75 S.Ct. at 857-58. In assessing the relative needs of different communities, the Commission looks to the number of broadcast facilities in each and their respective populations. Babcom, Inc., 27 F.C.C.2d 437, 438 (Rev.Bd.1971), set aside on other grounds, 31 F.C.C.2d 425 (1971). In this case, the Commission found that Portage, with only one daytime-only station for its 34,000 residents, had a greater need for additional radio service than Kalamazoo, which has a total of five stations for 86,000 people. Under Allentown Broadcasting, this finding permitted the FCC to award a dispositive 307(b) preference to the Portage applicants and eliminate WHW from further comparative consideration.
 
 
 8
 WHW does not dispute the general rule that under 307(b) the Commission may eliminate one applicant where a competing applicant proposes service to a community with greater radio needs. Rather, it advances two arguments for why that rule should not apply in this case. First, it argues that Portage and Kalamazoo are not separate communities but are instead integral parts of a single larger community, and therefore neither city should be preferred over the other. Second, it claims that by allocating channel 299 to Kalamazoo, the Commission misled WHW officials into proposing that city as its city of license, and should therefore not be allowed to dispositively prefer Portage over Kalamazoo. We reject both of these contentions.
 
 1. The Separate Communities Issue
 
 9
 In arguing that Portage and Kalamazoo constitute a single community, WHW relies principally on our decision in Huntington Broadcasting Co. v. FCC, 192 F.2d 33 (D.C.Cir.1951). In that case, the petitioner claimed it was entitled to a 307(b) preference because it proposed to broadcast from Huntington Park, a community with no local radio stations, while the competing applicant planned to locate its studio in Los Angeles, which already had a number of stations. Although Huntington Park was an independent municipality with its own civic, social, religious, educational and governmental organizations, this court upheld the FCC's ruling that the town was an integral part of the greater Los Angeles metropolitan area, and that appellant was therefore not entitled to any preference under 307(b). Since both applicants planned to broadcast to the Los Angeles region as a whole, the choice, as both the Commission and this court saw it,
 
 
 10
 was not as to which of two communities showed the greater need for a new station, but was rather which of two applicants would better serve the one large community which both desired to cover.
 
 
 11
 Id. at 35.
 
 
 12
 In Huntington, therefore, we approved the FCC's determination that when a suburban applicant proposes to serve a nearby larger urban area, a comparison of the suburban community's radio needs vis-a-vis the larger urban community is unnecessary. Following Huntington, however, the exact parameters of this exception to 307(b) were by no means certain, and problems subsequently arose concerning the Commission's somewhat inconsistent characterization of communities as either separate entities, or integral parts of larger regions. This court had occasion to consider the Commission's application of the Huntington doctrine in Miners Broadcasting Service, Inc. v. FCC, 349 F.2d 199 (D.C.Cir.1965). There, after canvassing FCC cases in which the Huntington issue was raised, we not only disapproved the Commission's use of the doctrine in the Miners Broadcasting case, but instructed the Commission to clarify the scope of the doctrine and to establish standards for distinguishing between suburban applicants. Id. at 201-02 nn. 5-6. The Commission responded with its Policy Statement on Section 307(b) Considerations for Standard Broadcast Facilities Involving Suburban Communities, 2 F.C.C.2d 190, 193 (1965) ("Suburban Community Policy "), which provided that under certain specified circumstances, a rebuttable presumption would arise that a suburban applicant for an AM broadcast license was in fact proposing to serve the nearby larger community.[17]
 
 
 13
 In 1969, the Commission extended the rationale of the Suburban Community Policy to FM licensing proceedings, but without the use of the presumption. Berwick Broadcasting Corp., 20 F.C.C.2d 393 (1969), modifying 12 F.C.C.2d 8 (Rev.Bd.1968), on remand, P.A.L. Broadcasters, Inc., 40 F.C.C.2d 546 (Rev.Bd.1973); see also The Suburban Community Policy, the Berwick Doctrine and the De Facto Reallocation Policy, 93 F.C.C.2d 436, 439 (1983) ("Suburban Community Policies Reconsidered "). Under Berwick, a suburban applicant had the burden of demonstrating that its proposed community of license had programming needs separate and distinct from those of the nearby larger city, and that those needs were unmet. See Suburban Community Policies Reconsidered, 93 F.C.C.2d at 449. Subsequent FCC decisions failed to define the precise nature of this burden, however, or to demonstrate how it differed from the burden facing suburban applicants in AM proceedings, where the presumption was employed. See, e.g., Radio Wheeling, Inc., 85 F.C.C.2d 486, 489 (Rev.Bd.1981) (criticizing Berwick standards as "unworkable"); Bie Broadcasting Co., 81 F.C.C.2d 1, 9 (Rev.Bd.1980) (noting infrequent application of the doctrine). These reasons, among others, have since led the Commission to abolish both the Suburban Community Policy and the Berwick doctrine. Suburban Community Policies Reconsidered, 93 F.C.C.2d at 449.[18]
 
 
 14
 Despite some of the confusion that has surrounded the application of Berwick, there is no doubt that the Berwick doctrine was in force at the time of the licensing proceedings in the instant dispute. As a consequence, WHW plainly did not enjoy the benefit of the rebuttable presumption that applies to suburban applicants for an AM broadcast license. Furthermore, we find that, under any application of the Berwick doctrine, there is ample evidence in the record supporting the ALJ's finding that Portage is a separate and distinct community in need of its first nighttime local outlet and its first competitive daytime station. Initial Decision, 89 F.C.C.2d at 881. Fully four pages of the ALJ's decision are devoted to a profile of Portage, outlining its physical dimensions, future development plans, local media, social and cultural activities, consumer spending patterns and economic development. Id. at 825-29. Appellant WHW offered no comparable information concerning Kalamazoo. Id. at 829 n. 9. On this record, there is no basis upon which we may overturn the ALJ's conclusion that Portage is a separate community with greater radio needs. This being so, under Allentown Broadcasting, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955), the Commission was entitled to award a dispositive preference to the Portage applicants and eliminate WHW from further consideration.
 
 2. The Allocation Claim
 
 15
 WHW further argues that because the Commission originally assigned channel 299 to Kalamazoo, it may not dispositively prefer Portage over Kalamazoo. To do so, WHW contends, would in effect punish a Kalamazoo applicant for proposing to serve the very city that the Commission deemed worthy of radio service in its FM Table of Assignments. This argument, however, misconstrues the purpose and operation of the FM assignment table. Under the Commission's "15-mile" rule in effect at the time of the assignment, the allocation of channel 299 to Kalamazoo made it available to both Portage and Kalamazoo applicants. Had the station been assigned to Portage, this same rule would have precluded Kalamazoo applicants from competing for it.[19]
 
 
 16
 Thus, the Kalamazoo assignment in no way represented a determination by the Commission that Kalamazoo's radio needs were greater than those of Portage; rather, it was designed to encourage applications from both communities so that their respective needs might be weighed in the licensing proceedings. It is therefore simply untenable to claim that the assignment conclusively established Kalamazoo as the preferred community, or that it somehow misled WHW into proposing to broadcast from that city. The 15-mile rule was clearly designed to promote flexibility and encourage applications from communities other than the assigned community. The rule and prior cases interpreting 307(b) were sufficient to put WHW on notice that the assignment of channel 299 to Kalamazoo did not bar applicants from communities other than Kalamazoo, nor did it preclude the possibility that another community might be deemed more deserving of additional radio service under 307(b). Application of the Commission's 15-mile rule resulted in no unfairness to WHW, and we decline to overturn a decision made in accordance with agency policy and judicial precedent.
 
 
 17
 II. THE RPI MISREPRESENTATION AND LACK OF CANDOR ISSUES
 
 A. Background
 
 18
 Emil J. Popke, RPI's sole owner, formerly owned 99.39% of Station WYYY in Kalamazoo. In 1979, he sold that station for approximately $400,000, 85% of which ($340,000) took the form of a promissory note secured by the assets and stock of WYYY's new licensee.[20] Appellants Sear and Air-Borne argued that this note was Popke's single largest asset and largest source of income, and that, as repayment of the note depended on WYYY's future success, Popke's creditor relationship with the station would lessen competition between RPI and WYYY. Accordingly, they argued that control of WYYY should be imputed to Popke and that RPI should be assessed a comparative demerit under the Commission's media diversification criterion.[21] In response, Popke submitted Exhibit 7, a financial statement listing among his assets real estate worth $430,000.[22] In an attached affidavit, he attested to the truth of the exhibit's contents.[23]
 
 
 19
 Sear subsequently discovered that Popke did not hold legal title to the land, but that his sisters did. The ALJ then expanded the issues to examine the facts and circumstances surrounding the preparation of Exhibit 7, and to determine whether Popke had lacked candor or had attempted to mislead the Commission by his submission. Popke conceded that his sisters held legal title to the property, acknowledging that he had transferred title to them in 1970, at a time when he was experiencing financial difficulties. He argued that the conveyance was made on an alleged understanding that his sisters would reconvey the property any time he requested, and that he was therefore the beneficial owner. He claimed that he had resided continuously on certain of the property, making improvements to it and discharging all indebtedness against it, and that upon his request in 1980 his sisters had reconveyed the property to him.[24] This ability to control the property, he argued, justified his belief that his sisters held title to the land only as his agents or trustees and that, whether or not he was technically the legal owner, his claim of ownership accurately reflected his true net worth.
 
 
 20
 Popke explained that his purpose in transferring title at a time of financial difficulty was not to defraud his creditors but to protect them. He testified that he was trying to avoid bankruptcy so that his creditors would receive their due, and that he wished to keep the land from becoming collateral for future business loans, thereby preserving this asset against possible default and providing him with reserve borrowing power. The fact that none of his creditors ever challenged the transfer, and that all his debts were eventually satisfied, were further proof, Popke asserted, of his good intentions.
 
 
 21
 The ALJ found these explanations completely unconvincing, concluding that the transfer had been a sham designed to deprive Popke's creditors of an asset from which they could satisfy their claims. He found that Popke had fallen far short of the Commission's standard of full candor and honesty by claiming that he owned certain property when he knew full well he lacked legal title to it. In addition, his purported reason for transferring the property "strain[ed] credulity," and demonstrated a serious lack of candor. Popke's demeanor, the judge noted, "was that of a person who, when faced with an embarrassing situation, persist[s] in his claim regardless of its hollowness." The ALJ concluded that RPI lacked the requisite qualifications to be a broadcast licensee, and therefore disqualified it.[25]
 
 
 22
 The Review Board overturned this decision. First, the Board rejected the ALJ's conclusion that the 1970 conveyance was a sham designed to thwart Popke's creditors, and therefore rejected the lack of candor findings premised on that conclusion. The Board stated that the ALJ's finding of a "sham" strayed far beyond the scope of relevant Commission inquiry and amounted to a "rump adjudication on the law of creditor's rights," unsupported by substantial evidence.[26] Second, the Board concluded that Popke's listing of the property among his assets did not amount to a misrepresentation. While acknowledging that it was "disquieted" by Popke's claim of ownership despite his knowledge that he lacked legal title, the Board nevertheless felt that Popke exercised sufficient dominion and control over the land to justify his belief that he was beneficial owner. Additionally, the Board felt that Popke's failure to qualify his claim was at most a minor financial inaccuracy insufficient to warrant any sanction.[27]
 
 B. Analysis
 
 23
 We note at the outset that applicants before the FCC are held to a high standard of candor and forthrightness. The Commission must license more than 10,000 radio and television stations in the public interest, and therefore relies heavily on the completeness and accuracy of the submissions made to it. RKO General, Inc. v. FCC, 670 F.2d 215, 232 (D.C.Cir.1981), cert. denied, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). Thus, "applicants ... have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate." Id. Indeed, not only does the Commission "refuse to tolerate deliberate misrepresentations," Nick J. Chaconas, 28 F.C.C.2d 231, 233 (1971); see also FCC v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946); WMOZ, Inc., 36 F.C.C. 202, 237-39 (1964), it may also premise a finding of lack of candor on omissions as well. RK General, Inc. v. FCC, 670 F.2d at 230. As the Board itself has stated, the "core" of a finding of lack of candor is an " 'omission ... [a] failure to be completely forthcoming in the provision of information which could illuminate a decisional matter.' " Coastal Bend Family Television, Inc., 94 F.C.C.2d 648, 658 (Rev.Bd.1983) (quoting Fox River Broadcasting, Inc., 88 F.C.C.2d 1132, 1137 (Rev.Bd.1982)). In reviewing the Board's application of these standards, we of course look only to see whether the Board's conclusions and findings are supported by substantial evidence and that they are not arbitrary or capricious.
 
 1. The 1970 Transfer
 
 24
 a. Scope of Inquiry
 
 
 25
 Following Sear's discovery that Popke lacked title to the property, the ALJ properly examined the circumstances surrounding the preparation and submission of Popke's Exhibit 7. The Board found no significant fault with this inquiry, Review Board, 89 F.C.C.2d at 805; rather, the Board objected to the ALJ's examination of Popke's intent and purposes in transferring the property and his findings concerning the propriety of Popke's business practices. Id. The Board noted that the Commission traditionally declines to examine alleged violations of local or federal law by applicants unless the alleged violations have been brought to the attention of the relevant governmental authority. Id. at 806 (citing Post-Newsweek Stations, Florida, Inc., 57 F.C.C.2d 1259 (1975); Bangor Broadcasting Corp., 33 F.C.C.2d 687 (Rev.Bd.1972)). Since none of Popke's creditors ever challenged his actions, in court or elsewhere, the Board concluded that the ALJ's examination of the transfer went beyond the proper scope of inquiry. Id. at 806-07.
 
 
 26
 The Board's analysis is patently shortsighted. As we have previously noted, the candor of applicants is always at issue, RKO General, 670 F.2d at 232, and, "[i]n cases involving charges of fraud or misrepresentation, the question of motive is always present." WMOZ, Inc., 36 F.C.C.2d at 209. Here, petitioners charged that Popke had misled the Commission by listing property he did not own. In response, Popke voluntarily described the circumstances surrounding the transfer in order to explain his claim of ownership. Thus, Popke himself placed the legitimacy of the transfer at issue. Where, as in this case, candor and motive are at issue, " 'the evidence must take a rather wide range and may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions.' " Id. (citation omitted). Petitioners argue, and the ALJ found, that the 1970 transfer was relevant not because of what it revealed about Popke's business ethics or practices, but because it demonstrated that he had a motive for attempting to mislead the Commission. Indeed, the ALJ found that "Popke deliberately withheld the truth as to the ownership of the land in RPI Exh[ibit] 7 to avoid the revelation of the circumstances surrounding its transfer and the fraud on creditors." Initial Decision, 89 F.C.C.2d at 879 n. 56.
 
 
 27
 In WWLE, Inc., 85 F.C.C.2d 68 (1981), the Commission upheld an inquiry as to the ownership interest of someone who held himself out to the Commission as part-owner of a licensed station. The Commission noted that the purpose of the investigation was not to determine the legal interests of the various owners of the station, but rather to assess the credibility and reliability of submissions made by the licensee. In order to establish the accuracy of the submissions, and thereby determine whether the licensee had misled the Commission, the ALJ first had to resolve questions concerning ownership of the station. Id. at 84-85. So too here, the purpose of examining the 1970 transfer was not to establish whether, as a matter of Michigan law, Popke had actually defrauded his creditors, but rather to assess the reliability of his submission to the Commission. There is more than enough evidence in the record to support the ALJ's express finding that, between 1970 and 1980, Popke claimed to own the property when it suited his purposes and failed to list the property when that suited his needs. See Initial Decision, 89 F.C.C.2d at 878. Surely an examination of such behavior is relevant to judging the reliability of an applicant's submissions or assessing his candor and forthrightness. Given the high standard of candor and honesty that applicants before the FCC are expected to meet, and given the broad range of relevance that the Commission has sanctioned when an applicant's motive and candor are at issue, we simply fail to see how the ALJ's examination of the 1970 property transfer exceeded the permissible bounds of inquiry. Popke's inconsistent and highly suspicious treatment of the property as sometimes his own and sometimes not, whether legal or not, certainly raised questions concerning his forthrightness. An inquiry into such conduct, rather than straying "far from the crux of the Commission's limited interest in Popke as a broadcast licensee" as the Board asserted, Review Board, 89 F.C.C.2d at 806, strikes at the heart of the Commission's interest in candid and honest applicants. We therefore reject the Board's holding that such an inquiry was improper.
 
 
 28
 b. Findings of "Fraud"
 
 
 29
 The Board dismissed as a "rump adjudication on the law of creditor's rights," the ALJ's conclusion that the 1970 transfer was a sham designed to mislead Popke's creditors. Id. This characterization, while perhaps colorful, is a product of the same flawed reasoning that led the Board to conclude that the entire inquiry into the transaction was improper. The Board stated that the evidence fell far short of demonstrating, "as a matter of law," that Popke defrauded his creditors, pointing to the fact that the transfer was open and notorious, none of the creditors ever questioned it, and all of the creditors were eventually paid off. Id. (emphasis in original). We do not read the ALJ's decision, however, as a determination of the legality of Popke's 1970 conveyance, nor was such a determination necessary to resolve the issue before him--namely, whether Popke was a reliable, credible and forthright applicant.
 
 
 30
 Popke claimed to own property to which he had no title. In an effort to explain this rather dubious claim, Popke described the circumstances surrounding the 1970 transfer of the property, stating that the conveyance was designed to aid his creditors. The veracity of this assertion, like that of any other submission to the FCC, was at issue. On its face, the statement is at best highly implausible and at worst utterly ridiculous. In essence, Popke claimed that he was protecting his creditors by depriving them of assets from which they could satisfy their claims, and that he was increasing his borrowing power by decreasing his personal assets. Even the most unsophisticated of businesspersons, which Mr. Popke clearly was not, would recognize the illogical and highly suspicious nature of these claims. Popke was then given the opportunity to prove his stated intentions. He testified that he wished to prevent the property from becoming collateral for future business loans, and in this way to give himself breathing room in his dealings with his creditors. He failed to explain, however, why he could not have achieved the same result by simply refusing to pledge the land as collateral. Initial Decision, 89 F.C.C.2d at 866 n. 41. Further, he stated that none of his creditors ever challenged the conveyance as fraudulent. But his attorney acknowledged that the deeds gave the appearance that the transfer was bona fide, a fact that tends to prove, rather than disprove, the possibility that creditors were misled. Id. at 866 n. 42. Finally, Popke pointed out that all his debts were eventually satisfied. The ALJ considered this evidence irrelevant; the crucial fact was that Popke had deprived his creditors of a potential source of satisfaction for their claims. Id. at 878.
 
 
 31
 Based on all the evidence before him, the ALJ concluded that Popke's purported reason for the transfer, which Popke himself placed at issue, was not worthy of belief. In reaching this decision, the ALJ had the further benefit of observing Popke's demeanor, which he found to be that of a less than forthright person. Id. at 879. The Board's conclusion that, as a matter of state law, Popke had not defrauded his creditors is entirely beside the point. The essence of the ALJ's conclusion is that Popke's explanation of the 1970 transfer demonstrated a lack of candor. This conclusion is supported by both the record and the ALJ's own credibility findings. While the Board is not absolutely bound by these findings, FCC v. Allentown Broadcasting Co., 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147 (1955); Moore v. Ross, 687 F.2d 604, 608-09 (2d Cir.1982), cert. denied, 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 969 (1983), it may not upset them unless its reversal is supported by substantial evidence. Moore v. Ross, 687 F.2d at 609.[28] Here, instead of offering substantial evidence, the Board misconstrued the thrust of the ALJ's determination and then overturned that decision by relying on the completely irrelevant assertion that Popke arguably did not violate state law. The Board's disposition of this matter simply cannot stand. The ALJ disqualified RPI in part because he found that Emil Popke lacked candor before the Commission. To reverse this finding on the grounds that Popke's conduct did not amount to common law fraud is in error.
 
 2. Popke's Claim of Ownership
 
 32
 The Board also erred when it overruled the ALJ's determination that Popke misled the Commission by claiming he owned property to which he had no legal title. The Board recognized that Popke had a motive to maximize his assets and admitted that it was "disquieted" by his claim of ownership, noting that it expects "ownership" to be synonymous with legal title. Review Board, 89 F.C.C.2d at 807. Nevertheless, the Board concluded that Popke listed the property in good faith and that his failure to qualify his claim amounted to nothing more than a minor financial inaccuracy. In so ruling, the Board relied principally on the fact that Popke had followed the advice of his counsel, Quinn Benson, when listing the asset, and that Popke had the apparent ability to control the land despite the transfer of the property to his sisters. Id.
 
 
 33
 a. Reliance on Counsel
 
 
 34
 While the Board found it significant that Popke relied on the advice of his lawyer, it conveniently overlooked the fact that Benson is himself an officer and director of RPI, and is therefore an interested party. As we observed in RKO General,
 
 
 35
 reliance on counsel may render a severe sanction such as disqualification too harsh in some circumstances.... But "advice of counsel cannot excuse a clear breach of duty by a licensee." Asheboro [Broadcasting Co., 20 F.C.C.2d 1, 3 (1969) ]. The client becomes fully responsible at some point, and that point is reached more quickly in practice before the FCC than in courts of law.
 
 
 36
 670 F.2d at 231. In WEBR, Inc. v. FCC, 420 F.2d 158 (D.C.Cir.1969), we approved the Commission's decision to assess a comparative demerit against an applicant who relied on counsel and failed to amend an application, even though it was highly unlikely the amendment would have had any effect on the FCC's ultimate decision. Id. at 167-68. If, as RKO General and WEBR make clear, applicants are responsible for actions they take when relying on the advice of counsel in the normal attorney-client setting, it is difficult to understand how the Board could view Benson's advice as a mitigating factor here, when Benson is himself an officer of RPI. In effect, the Board has decided that where the president of a company acts pursuant to the improper advice of another officer of the company, the company and both officers are absolved of any blame for wrongdoing. Such a rule does not survive its own statement.
 
 
 37
 Here, both Popke and Benson admitted that Popke was concerned about the propriety of listing the property as his own, yet neither thought to consult independent counsel on the issue. Instead, Popke was content to rely on Benson's conclusions, and the Board was content to rely on Popke's reliance, treating Benson's advice as though it were that of a disinterested third party. The Board's action in this regard is irreconcilable with both the principles set forth in RKO General and the Commission's own decision in WEBR. As such, it provides no such support for the Board's reversal of the ALJ's finding of misrepresentation.
 
 
 38
 b. Ability to Control the Land
 
 
 39
 The Board placed great emphasis on the fact that Popke had the apparent ability to exert dominion and control over the property. Of course, Popke lacked the most obvious indicia of control--legal title to the property. Nevertheless, he claimed in a July 1980 affidavit that his sisters "held the deed as [t]rustees or [a]gents for [a]ffiant...." Reprinted in J.A. 158. The deed, however, created no such relationship, and neither Popke nor the Board cited any Michigan authority even suggesting that Popke could have enforced his sisters' oral promise to reconvey the property, either in an action at law or in equity. Indeed, Benson acknowledged that the death of both sisters, the incompetency of one, or a judgment against one or both could have prevented the reconveyance. Initial Decision, 89 F.C.C.2d at 878. Nor have we found any Michigan law lending support to Popke's claim or the Board's holding. On the contrary, our own review of the Michigan authorities indicates that Popke had no colorable claim whatsoever to the property.[29]
 
 
 40
 Popke's apparent ability to control the land was nothing more than the appearance of dominion. To the extent he controlled the land, he did so not as a matter of right, but through the grace of his sisters. Nothing in the record suggests otherwise. In 1973, Popke negotiated the sale of a portion of the land, but the purchaser insisted that Popke's sisters execute the sale documents. That same year he arranged to mortgage part of the land, again with the participation of his sisters, who signed the mortgage note. His sisters even paid the property taxes on the land, with Popke reimbursing them afterwards. Id. at 870. That he resided on certain of the land continuously and made improvements to it, or that his sisters reconveyed it to him in 1980 upon his request, in no way negates the fact that Popke enjoyed the land only at the pleasure of his sisters. For the Board to rule that such superficial control is an adequate basis for claiming legal title, without even consulting Michigan law on the question, was clearly in error.
 
 
 41
 c. Minor Financial Inaccuracies
 
 
 42
 The Board characterized as a minor financial inaccuracy Popke's failure to qualify in any way his claim of ownership, and concluded that such an error did not warrant any sanction. Review Board, 89 F.C.C.2d at 807. In other cases where the Commission has excused financial inaccuracies, however, the errors have been inadvertent, see, e.g., L.B. Wilson, Inc., 37 F.C.C. 511, 548-49 (1964) (applicant, relying on independent certified public accountant, failed to report current liabilities of $120,000), aff'd sub nom., South Florida Television Corp. v. FCC, 349 F.2d 971 (D.C.Cir.1965), cert. denied, 382 U.S. 987, 86 S.Ct. 541, 15 L.Ed.2d 475 (1966); or immaterial, see, e.g., Beneficial Broadcasting, Inc., 61 F.C.C.2d 1005, 1008 (1976) (applicant failed to report restraining order issued in divorce proceeding barring applicant from disposing of personal property except for operation of his daily business); Western Television Co., 50 F.C.C.2d 1165, 1167 (Rev.Bd.1975) (failure to report bankruptcy of corporation of which applicant was president held immaterial because no evidence that it had any effect on applicant's financial qualifications); Emerald Broadcasting Co., 30 F.C.C.2d 879, 888 (1971) (failure to amend statement to reflect increase of applicant's indebtedness from $53,000 to $63,000 immaterial). By contrast, Popke's misstatement did not involve an immaterial issue, but rather a matter of possibly decisional significance. The property Popke claimed as his own was his single largest asset, and he listed it in order to demonstrate his financial independence from another local radio station. In addition, his failure to qualify his claim could hardly be viewed as inadvertent, given the fact that he and Benson discussed the matter prior to submitting the statement.
 
 
 43
 In its decision, the Board relied on Scott & Davis Enterprises, Inc., 88 F.C.C.2d 1090 (Rev.Bd.1982), where it refused to disqualify an applicant who failed to disclose the ownership interests of persons other than himself in certain certificates of deposit. That case, however, lends little support to the Board's action. There the applicant actually had legal title to the certificates, but failed to reveal that he was not the sole owner. Popke's sin of omission was not so much his failure to disclose the ownership interests of others, but his failure to reveal that he himself had no legal title to the property at all. In addition, the inaccuracy at issue in Scott & Davis was clearly immaterial; the Board found that there had never been any doubt that the applicant was financially qualified. Id. at 1099. Here, however, Popke's financial dependence on station WYYY was very much at issue, and Popke asserted ownership of the property in order to resolve that dispute.
 
 
 44
 In short, the Board's action is inconsistent with prior agency decisions. Popke's claim that he owned property to which he had no legal title was, under the circumstances of this case, a material misstatement. The Board's contrary conclusion is clearly in error.
 
 
 45
 d. Summary
 
 
 46
 We are more than "disquieted" when an applicant claims to own property knowing full well that he lacks legal title to it. Such a claim, in our view, does not satisfy the high standards of forthrightness and honesty that FCC applicants are expected to meet. Neither Mr. Popke's reliance on the advice of his counsel, nor his ability to enjoy the property in any way excuses what the record demonstrates was a deliberately false statement. We therefore hold that the Board's complete exoneration of Mr. Popke was, on the record before us, arbitrary, capricious and inconsistent with both judicial and agency precedent.
 
 III. CONCLUSION
 
 47
 We find the dispositive preference awarded the Portage applicants under section 307(b) consistent with both agency and judicial precedent. We therefore affirm the Board's decision rejecting WHW's claims.
 
 
 48
 We reverse the Board's determination in favor of RPI on the lack of candor and misrepresentation charges. On the record here, we can find no substantial evidence to support the conclusions reached by the Board; we also find the Board's judgment on these issues to be arbitrary, capricious and at odds with both agency and judicial precedent. In light of these findings, the grant of authority to RPI to construct an FM broadcast facility cannot stand. We therefore remand the case for a determination, consistent with this opinion, of an appropriate sanction to be imposed for Popke's lack of candor and material misrepresentations in connection with RPI's application. Following this determination, the agency shall then reconsider which of the Portage applicants should be awarded the authority to construct the new broadcast facility in Portage.
 
 
 49
 We affirm the decision of the Board as to all remaining claims.
 
 
 50
 So ordered.
 
 
 
 [1]
 Amendment of Section 73.202(b) Table of Assignments, FM Broadcast Stations (Kalamazoo and Portage, Mich.), 55 F.C.C.2d 576 (1975)
 
 
 [2]
 WHW Enterprises, Inc., 89 F.C.C.2d 821 (1981) ("Initial Decision ")
 
 
 [3]
 47 U.S.C. Sec. 307(b) (1982). Section 307(b) provides in pertinent part:
 In considering applications for licenses ... when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.
 
 
 [4]
 Initial Decision, 89 F.C.C.2d at 881
 
 
 [5]
 Id. at 879
 
 
 [6]
 Id. at 887
 
 
 [7]
 89 F.C.C.2d 799, 808-12 (Rev.Bd.1982) ("Review Board ")
 
 
 [8]
 Id. at 814-18
 
 
 [9]
 We reject the petitioners' other claims as we find them to be plainly without merit
 
 
 [10]
 See Initial Decision, 89 F.C.C.2d at 824-26
 
 
 [11]
 Id. at 826-29
 
 
 [12]
 Id. at 829 n. 9
 
 
 [13]
 Id. at 881
 
 
 [14]
 Initial Decision, 89 F.C.C.2d at 880; Review Board, 89 F.C.C.2d at 809-10
 
 
 [15]
 Initial Decision, 89 F.C.C.2d at 881; Review Board, 89 F.C.C.2d at 811
 
 
 [16]
 Consistent with agency practice, the ALJ did make contingency comparative findings with respect to WHW under the FCC's ownership integration and diversification criteria. Initial Decision, 89 F.C.C.2d at 884, 886-87
 
 
 [17]
 The Suburban Community Policy provided that where the applicant's proposed 5 mv/m daytime contour would penetrate the geographic boundaries of any community with a population of over 50,000 persons and having at least twice the population of the applicant's specified community, a presumption would arise that the applicant realistically proposed to serve that larger community rather than its specified community. 2 F.C.C.2d at 193
 
 
 [18]
 We wish to make clear that we express no opinion concerning the merits of the FCC's decision in this regard
 
 
 [19]
 At the time of the proceedings in dispute here, section 73.203(b) of the Commission's Rules permitted applicants to apply for the use of a class B FM channel either in the community to which it had been assigned in the FM table of assignments, or in any other community within 15 miles of the assigned community, provided the requested community was not listed in the FM table. Because Kalamazoo was listed in the FM table, assignment of the channel to Portage would have barred all Kalamazoo applicants from competing for it. Portage, however, was not listed in the FM table. By assigning the channel to Kalamazoo, the Commission made it possible for applicants from both Portage and Kalamazoo to compete. Section 73.203(b) has since been rescinded. See Suburban Community Policies Reconsidered, 93 F.C.C.2d at 452
 
 
 [20]
 See Initial Decision, 89 F.C.C.2d at 843
 
 
 [21]
 In its Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394-95 (1965), the FCC stated that diversification of the media of mass communications is a "factor of primary significance," and that, in order to maximize competition both economically and in the marketplace of ideas, it "will consider both common control and less than controlling interests in other broadcast stations" when assessing the comparative merits of competing applicants. In Morris, Pierce & Pierce, 88 F.C.C.2d 713, 717-19 (Rev.Bd.1981), the Board decided that a debtor-creditor relationship, standing alone, does not impair an applicant's basic qualifications to be a licensee. Although Morris was issued shortly before the Initial Decision in this case, the issue of whether debtor-creditor relationships warranted a comparative demerit had not yet been resolved at the time of the licensing proceedings here in dispute. Thus, when Popke submitted Exhibit 7, he had every reason to maximize his assets in order to demonstrate his independence from station WYYY, a fact the Board itself acknowledged. Review Board, 89 F.C.C.2d at 807
 
 
 [22]
 Initial Decision, 89 F.C.C.2d 861-62
 
 
 [23]
 Id. at 862
 
 
 [24]
 Id. at 870-74
 
 
 [25]
 Id. at 877-79
 
 
 [26]
 Review Board, 89 F.C.C.2d at 806
 
 
 [27]
 Id. at 807-08
 
 
 [28]
 See also Penasquitos Village, Inc. v. NLRB, 565 F.2d 1074, 1078 (9th Cir.1977); Ward v. NLRB, 462 F.2d 8, 12 (5th Cir.1972); NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 499 (2d Cir.1967)
 
 
 [29]
 See, e.g., Musial v. Yatzik, 329 Mich. 379, 382, 45 N.W.2d 329, 331 (1951) (oral promise to reconvey property creates unenforceable parol trust only); Stephenson v. Golden, 279 Mich. 710, 733, 276 N.W. 849, 857 (1937) (same); Funk v. Engel, 235 Mich. 195, 197, 209 N.W. 160, 161 (1926) (trust in land cannot be created by parol); Poppe v. Poppe, 114 Mich. 649, 650, 72 N.W. 612, 613 (1897) (promise by grantee of land to reconvey the same void under the Statute of Frauds). We of course do not purport to decide what Michigan law is or should be with respect to oral promises to reconvey realty, nor need we do so. Under the circumstances of this case, Popke clearly bore the burden of demonstrating that he had at least a colorable claim to the property. This he did not do; our review of the authorities simply suggest that he could not have advanced such a claim